**ARROWBLUE, PLLC**
Michael A. Goldberg (pro hac vice application forthcoming)
*mike@arrowbluelaw.com*
2920 W Broad St., Suite #139
Richmond, VA 23230
Tel: (804) 651-6738

**CHRISTINE BROWN SPORTS LAW, PLLC**
Christine D. Brown (pro hac vice application forthcoming)
*christine@christinebrownsportslaw.com*
Ben LaCourse (pro hac vice application forthcoming)
*ben@christinebrownsportslaw.com*
1700 East Putnam Ave., Suite 210
Old Greenwich, CT 06870
Tel: (203) 684-1834

**BURNS CHAREST LLP**
Matt Strauser (pro hac vice application forthcoming)
*mstrauser@burnscharest.com*
Christopher J. Cormier (pro hac vice application forthcoming)
*ccormier@burnscharest.com*
Ian U. Baize (pro hac vice application forthcoming)
*ibaize@burnscharest.com*
1300 Connecticut Ave., NW, Suite 1075
Washington, DC 20036
Tel: (202) 577-3977

**BROWN, NERI, SMITH & KHAN, LLP**
Andrew M. Purdy (CA Bar No. 261912)
*andrew@bnsklaw.com*
650 Town Center Drive, Suite 520
Costa Mesa, CA 92626
Tel: (949) 676-0030

*Attorneys for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONNOR PRINTZ, CHRIS JENNINGS, and JACKSON HALE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

**Case No.**

**CLASS ACTION COMPLAINT**

**ACTION SEEKING NATIONWIDE RELIEF**

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I. INTRODUCTION .......... 3
II. PARTIES .......... 17
A. Plaintiffs .......... 17
B. Defendant .......... 22
C. Co-Conspirators .......... 22
III. JURISDICTION AND VENUE .......... 22
IV. FACTUAL ALLEGATIONS AND LEGAL BACKGROUND .......... 23
A. History of Amateurism and Restraints on Athletic Aid .......... 23
B. Creation of the Division System ..........
C. Divisions II and III Surrender "One-Institution, One-Vote" Governance in Exchange for Guaranteed Payments of Division I-Generated Revenue ..........
D. The Division III Athletic Aid Prohibition Is an Illegal Horizontal Agreement to Fix the Price of Division III Athletic Labor at Zero .......... 30
E. Other NCAA Bylaws Entrench the Athletic Aid Fixing Conspiracy ..........
F. The Price Fixing Conspiracy Has Produced Anticompetitive Effects .......... 40
G. The Conspiracy Has Produced No Procompetitive Benefits .......... 48
H. Relevant Market and Market Power .......... 48
V. INTERSTATE TRADE AND COMMERCE .......... 51
VI. CONTINUING VIOLATION .......... 51
VII. CLASS ACTION ALLEGATIONS .......... 52
CLAIM FOR RELIEF .......... 55
COUNT I .......... 55
PRAYER FOR RELIEF .......... 57
DEMAND FOR JURY TRIAL .......... 58

Plaintiffs Connor Printz, Chris Jennings, and Jackson Hale bring this action individually and on behalf of a Class (defined below) of all others similarly situated against the National Collegiate Athletic Association ("NCAA" or "Association"), and allege the following:

## I. INTRODUCTION

1. The NCAA has engaged in an ongoing conspiracy to fix the price of Division III athletic labor at zero by prohibiting every member of Division III, the NCAA's largest division at more than 400 schools, from offering a single penny of athletic scholarship.

2. The agreement is not a hidden one. It is written down in plain terms in the NCAA's constitution and bylaws, republished every year, policed by a compliance apparatus, and enforced by sanctions up to and including the termination of an offending athletic program. NCAA Division III Bylaw 15.01.3 provides that a member institution "**shall not award financial aid to any student on the basis of athletics leadership, ability, participation or performance**." NCAA Div. III Bylaw 15.01.3 (adopted 7/20/22) (emphasis added). And every NCAA member, across the NCAA's three divisions, has committed to honor and enforce that aid fix through the NCAA Constitution, which provides that college athletes may only be compensated by a member institution for participating in a sport "**in accordance with guidelines established by their NCAA division**." NCAA Const. art. 1(B) (emphasis added).[1] Through that provision, the entire NCAA membership prohibits more than 400 members of Division III, competitors in every meaningful sense, from offering one of the most common discounts on an American college education—the athletic scholarship.

---

[1] The Constitution also confirms that no NCAA division can dismantle its own scholarship restraints unilaterally because the NCAA's Board of Governors retains authority to "[c]all for a vote of the entire membership on the action of any division that it determines to be contrary to the basic purposes and general principles set forth in the Association's Constitution." NCAA Const. art. 2(A)(3)(d)(xi).

3. The NCAA entrenches that agreement through a set of interlocking restraints. Its divisional classification rules prevent a school from moving between divisions without committing to substantial capital investment across a full suite of NCAA sports. Its Constitution guarantees the lower divisions a fixed share of the revenue from March Madness and the other Division I championships (NCAA Const. art. 3(A)), products those lower divisions do not produce, so long as they remain NCAA members and do not defect to a rival association, like the National Association of Intercollegiate Athletics ("NAIA"), that would allow the schools to offer athletic aid. And the NCAA's scheduling requirements further punish any school that would consider defecting to a rival association.

4. The Association's enforcement apparatus culminates in the sanction known throughout college sports as the "death penalty"—the NCAA's power to shut down an offending athletic program outright. That sanction has historically been reserved for the gravest corruption in college athletics, point-shaving scandals and academic fraud. Yet its only modern deployment was against a Division III tennis program whose offense was that its players received modest tuition reductions as consideration for their athletic contributions to their college. In the eyes of the modern NCAA, the offense deserving of the most severe punishment is not the corruption of its games or its educational mission but the undermining of its price fixing scheme.

5. The Division III schools bound by the athletic scholarship ban are not a marginal corner of higher education. Division III is the Association's largest and fastest-growing division by school count,[2] and it comprises a massive swath of the

[2] NCAA membership has grown from roughly 800 schools in 1989 to nearly 1,100 today, with very few examples of institutions leaving the Association entirely, and the growth has been concentrated in Division III, which was roughly equal in size to Division I in 1989 and has since expanded by 35%, roughly 50% faster than Division I's rate of expansion. The schools controlling NCAA governance and revenue have little interest in admitting new Division I competitors who might dilute their share of

American college market, including many of the nation's most selective institutions and largest endowments, such as MIT, the University of Chicago, Johns Hopkins, Williams, NYU, Amherst, and Caltech. These schools compete ferociously with one another for students, faculty, donors, rankings, and prestige. Many Division III members even maintain athletic budgets that far outpace those of Division I and Division II institutions; yet they have agreed not to deploy a single dollar of those budgets in the form of athletic aid that would reduce the cost of college for their athletes.

6. The Association's Constitution was ratified by the entire NCAA membership as recently as 2022, and through it roughly 1,100 NCAA members across all divisions bind themselves to the aid guidelines of their respective divisions. Read together, Article 1(B) and Bylaw 15.01.3 establish an Association-wide market allocation and price fixing structure. The entire NCAA agrees to abide by the divisional classification system with full knowledge that the Division III bylaws cap athletic aid across more than 400 competitors at $0, anchoring the entire market from below.

7. At the Division III level, athletic scholarships are prohibited no matter how useful they would be to the schools competing ferociously for students, and no matter how valuable Division III athletic programs, and the labor that sustains them, may be to those institutions as engines of enrollment yield, earned media, donor cultivation, and, increasingly, direct revenue. As the Supreme Court explained in its unanimous decision in *NCAA v. Alston*, competition among colleges for these benefits is the natural state, as "schools across the country" have long "sought to leverage sports to bring in revenue, attract attention, boost enrollment, and raise money from alumni." 594 U.S. 69, 76 (2021). Those four institutional returns on

---

the prime revenue pools, and every interest in growing the segment of the Association that functions primarily as an anchor dragging down the cost of college athletics' most important input, athletic labor.

athletics—revenue, earned media, enrollment yield, and donor cultivation—are referred to in this Complaint collectively as the "Four Benefits."

8. The same unanimous *Alston* Court rejected the NCAA's claim to any special immunity from the Sherman Act absent an act of Congress, *id*. at 95–96, made clear that "multi-conference agreements" restricting athletic aid are subject to antitrust scrutiny, *id*. at 85, 90–91, and stripped "amateurism" of any status as a self-executing procompetitive justification, finding that the NCAA had "nowhere define[d] the nature of the amateurism [it] claim[ed] consumers insist upon" and that the district court could identify no "coherent definition" of the term. *Id*. at 83, 101. That logic has only sharpened with time, as even Division III athletes, including Plaintiffs Printz and Hale, routinely receive name, image, and likeness ("NIL") compensation that would have been plainly incompatible with the amateurism the NCAA professed to require for its survival just a few years ago. In any event, the NCAA has long permitted athletic aid at its Division I and Division II member institutions without ever suggesting such aid threatens amateurism.

9. The Division III prohibition on athletic aid is undeniably a multi-conference agreement in *Alston*'s own taxonomy, a single mandatory rule binding over 400 schools across more than forty conferences, adopted and enforced through the machinery of the dominant Association itself. In 2025, faced with a similar antitrust challenge to its Division I scholarship caps, the NCAA did not defend those caps. It eliminated them, agreeing in the *House* settlement to replace per-sport scholarship limits with roster limits at participating Division I schools, freeing those schools to fund as many scholarships as their rosters allow. *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal.). The market's verdict came quickly, as roster positions long treated by convention as walk-on, non-scholarship roles, the college placekicker being one example, began commanding scholarships and significant NIL compensation almost as soon as the caps fell. *See* Rachel Bachman, *College*

*Football Kickers Were Underpaid. Then They Started Texting*, Wall St. J. (Sept. 7, 2026). Even Division I's comparatively generous caps had suppressed the output of athletic aid below competitive levels. And yet, the Division III prohibition, the harshest aid restraint in college sports, lingers on.

10. Division III schools remain free to differentiate themselves along every dimension that does not fix the price of the labor that sustains the marquee recruiting tools that are their athletic programs. They may adopt higher academic standards, play fewer games, impose stricter limits on practice time, and make the individual choice to invest less in athletics than their Division I and Division II counterparts. Any one of them may decide, unilaterally, not to offer athletic scholarships. What they cannot do is collectively define Division III as a non-scholarship division, agree among themselves to enforce that definition on pain of expulsion, and then offer the definition itself as the agreement's justification. Such sleight of hand is the exact arrangement Justice Kavanaugh warned against in his concurrence in *Alston*, when he explained that the NCAA could not "avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." 594 U.S. at 110 (Kavanaugh, J., concurring).

11. An athletic program is, at bottom, an educational amenity, and for hundreds of thousands of students choosing a college each year it is a principal amenity, frequently the dispositive one. The labor each athlete puts into that amenity helps the asset appreciate and serve the same purpose for the next crop of students. A halfback may choose a college for the amenity of college football. A classmate may choose the same college and give back to it for decades because the halfback helped the school triumph over its rival at homecoming. The school collects all Four Benefits flowing from the Division III athlete's labor, the revenue it produces, the attention it draws, the enrollment it yields, and the loyalty it cultivates, while agreeing as a cartel to pay nothing for it.

12. For Division III institutions, the enrollment benefit is particularly significant. Athletic programs are not merely amenities that attract prospective students; at many schools, they are central to the institution's overarching recruitment and enrollment strategy. The NCAA itself reports that one in five undergraduate students at Division III institutions participates in intercollegiate athletics.[3] At many Division III colleges, varsity athletes make up a quarter or more of the entire student body, and at close to 40 institutions, the share approaches or exceeds half.

13. Athletics is not a sideshow at many Division III institutions. The institutions themselves recognize the central role athletics plays in their student populations, enrollment strategies, and students' decisions to attend. Huntingdon College President Dr. Anthony Leigh states that approximately 70% of Huntingdon's student body participates in athletics, while describing Division III and its student-athletes as the "gold standard of amateur athletics," citing the absence of athletic scholarships as a distinguishing feature of Division III.[4] Hilbert College expressly identifies increasing athletic participation and leveraging athletics to recruit, engage, and retain students as priorities in its institutional strategic plan.[5] Rhodes College, meanwhile, reported that 95% of surveyed graduating student-athletes would not have picked a school had their sport not been offered.[6] These examples are only a few of many that demonstrate the primacy of athletics as a recruiting tool and institutional asset for Division III institutions. They also

[3] *See* Nat'l Collegiate Athletic Ass'n, *Division III 2026–27 Facts and Figures*, https://ncaaorg.s3.amazonaws.com/about/d3/D3_FactsandFigures.pdf.

[4] *See* Anthony J. Leigh, *A Celebration of NCAA Division III*, Huntingdon Coll. (Apr. 6, 2026), https://www.huntingdon.edu/a-celebration-of-ncaa-division-iii-2/.

[5] *See* Hilbert Coll., *Hilbert 2025*, https://www.hilbert.edu/about/mission-vision-values/hilbert-2025/ (last visited Oct. 17, 2026).

[6] *See* Rhodes Coll., *Going for Gold* (Feb. 3, 2026), https://news.rhodes.edu/magazine/fall-2025-winter-2026/going-gold.

underscore how heavily these schools rely on their current athletes to maintain that asset and keep it appreciating year in and year out.

14. When an athlete's anticipated Four Benefits value exceeds the full cost of tuition, the market has historically found a way to accommodate the mismatch. Before the NCAA's 1906 founding, the schools that would become Division III members competed for athletic labor by paying for it, and none more openly than the University of Chicago, now a Division III member, which established an $80,000 trust fund, roughly $2.86 million in today's dollars, "earmarked" for "recruiting and subsidizing athletes." Chicago's president left no doubt about the fund's purpose: "We will give them a palace car and a vacation too."[7] In higher NCAA divisions today, the NCAA allows athletic aid up to the full cost of attendance, revenue sharing, and NIL compensation measured by athletic value. Division III, however, wields Bylaw 15.01.3 to prohibit an athlete from converting any portion of that labor into even a modest reduction in the price of an education, all while the same athlete remains fully eligible to collect NIL payments from third parties, largely measured by the very athletic ability that his or her school may not recognize with a single dollar of athletic scholarship aid.

15. The NCAA's interlocking divisional classification rules entrench the conspiracy by barring a Division III school from offering athletic aid in any individual sport or sports where it holds a genuine comparative advantage unless it reclassifies its entire athletics department into a higher division. That reclassification requires the school to sponsor at least nine to fifteen other NCAA sports at the higher division's standards and to fund aggregate athletic aid minimums across all of them. The rule is an all-or-nothing provision. A school either offers no athletic aid, or it produces an entire portfolio of NCAA-dictated products at once.

---

[7] Gerald Gurney, Donna A. Lopiano & Andrew Zimbalist, *Unwinding Madness: What Went Wrong with College Sports—and How to Fix It* 6 (2017).

16. The NCAA has built a natural experiment that reveals what this prohibition suppresses. A handful of Division III institutions were permitted to keep individual programs in Division I when the Association closed the formerly open multidivisional pathway that allowed schools to sponsor sports in more than one division. These schools' continued sponsorship of select Division I programs in an athletic department that otherwise fields programs that compete in Division III demonstrates that Division III schools would—and do—pay for athletic labor when the prohibition on athletic aid does not apply. Johns Hopkins's ("Hopkins") own athletic department has explained the asymmetry in plain terms when discussing its Division I men's and women's lacrosse teams: "Because both teams are NCAA Division I members, they, unlike our other sports at Hopkins, are permitted by NCAA legislation to provide athletic scholarships."[8] The same Division III schools also freely award athletic aid in sports the NCAA does not govern, including sports like boxing, archery, and cheer. For example, The University of Olivet, a small, private Christian college in Michigan, advertised in its 2016–17 Academic Catalog that "***[s]cholarships are available for*** the following activities: gospel choir, marching band, music (other than marching band), and ***non-NCAA DIII collegiate sports including boxing, cheer and bowling***."[9] The University further emphasizes on its website—under the subpage *Scholarships and Grants*—that "[i]n addition to [its] NCAA Division III sports teams, The University of Olivet has competitive bowling Esports, Archery and Clay Target teams. As a member of either team, you are able to receive scholarship for your skills."[10]

[8] *See* Olivia Spector, *Hopkins Athletics Adheres to NCAA Guidelines in Fund Allocation*, The Johns Hopkins News-Letter (Oct. 11, 2012), https://www.jhunewsletter.com/article/2012/10/hopkins-athletics-adheres-to-ncaa-guidelines-in-fund-allocation-58114.

[9] *See* Olivet Coll., 2016–17 Academic Catalog 20 (2016), https://www.uolivet.edu/wp-content/uploads/2016/10/2016-2017-Academic-Catalog_0.pdf (emphasis added).

[10] *See* The Univ. of Olivet, *Scholarships & Grants*, https://www.uolivet.edu/admissions/scholarships-and-grants/ (last visited Oct. 17, 2026).

17. The University of Olivet's esports scholarship program only exists because, after studying the activity for eighteen months, the NCAA declined to govern the activity in 2019, allowing a collegiate scholarship market measured in the tens of millions of dollars annually to spring up in under a decade. Roughly fifty Division III institutions now routinely offer annual esports scholarships in the tens of thousands of dollars.

18. Each of these experiments shows that Bylaw 15.01.3 suppresses these schools' ability to compete for students through athletic aid, not their appetite to do so.

19. Division III schools are thus boxed in on all sides. The bylaws forbid the aid. The classification rules forbid targeted investment in a single program. The NCAA Constitution guarantees the lower divisions a fixed share of revenue they do not generate, consideration that would be forfeited upon departure to an aid-permitting association like the NAIA. And the NCAA's scheduling rules ensure that a school that leaves will struggle to field a schedule, because its former competitors may not count contests against it toward their own NCAA sponsorship and championship eligibility. The distributions pay schools to stay, and the scheduling rules punish schools that leave, conscripting the departing school's own competitors as the instrument of the penalty. Together they explain how more than 400 sophisticated and otherwise fiercely competitive institutions have adhered for five decades to a rule forbidding them to compete.

20. Because the price of athletic labor is fixed at zero, Division III schools have no choice but to compete on quality rather than price. That is why Division III facilities routinely rival, and sometimes outpace, their Division I counterparts. Kenyon College spent $70 million on its Lowry Center athletic complex, and when it built a similarly impressive football stadium in 2025, it explained the economic logic behind the projects in its own words: "[a]s a Division III school, Kenyon

College cannot offer athletics scholarships, so state-of-the-art facilities, like the Lowry Center and now the field, can be a big draw."[11] Denison University, whose athletic budget outpaces many Division I and Division II schools, completed a $38.5 million construction and renovation project centered on its Mitchell Center athletic complex in 2013, boasting that a "focal point" of the project, its Trumbull Aquatics Center, was now "[o]ne of the finest aquatics facilities in the Midwest."[12] Denison also recently opened a $5.5 million lacrosse and soccer stadium in 2024, emphasizing that its "men's and women's lacrosse and soccer teams have been nationally prominent since their earliest days" and that each of the programs "competes and contends for conference and national titles year in and year out."[13]

21. The members of the Southern California Intercollegiate Athletic Conference ("SCIAC"), which prohibits preferential financial aid based on athletic status through its bylaws and whose members are also bound by the NCAA's Division III prohibition on athletic aid, illustrate the same pattern: when insulated from competition over athlete compensation, the competition migrates to facilities and other inputs designed to attract and retain athletic talent.[14] Chapman University raised $6 million to construct a new tennis center designed to transform its facilities from "the least impressive" in the SCIAC to "the very best," and once it opened, a Chapman athlete described the facility—complete with a "players' lounge"—as "a

---

[11] *See* Kenyon Coll., *Kenyon Athletic Center*, https://digital.kenyon.edu/archives-timeline/3/ (last visited Oct. 17, 2026); Molly Vogel, *Kenyon Football Takes to a New Field, Thanks to Alumni Fundraising Effort*, Kenyon Coll. (Sept. 8, 2025), https://www.kenyon.edu/news/archive/kenyon-football-takes-to-a-new-field-thanks-to-alumni-fundraising-effort/.

[12] *See* Denison Univ., *The Mitchell Center* (noting that the Mitchell Center's renovation and expansion was a $38.5 million project, including the Trumbull Aquatics Center, coaching offices, athletic-training facilities, and fitness space), https://bigred.denison.edu/sports/2020/5/28/facilities-mitchell-center.

[13] *See* Denison Univ., *Kienzle-Hylbert Stadium* (stating that Denison broke ground in 2023 on a $5.5 million lacrosse and soccer stadium that opened for the 2024 spring season), https://denison.edu/map/places/kienzle-hylbert-stadium.

[14] *See* Southern California Intercollegiate Athletic Conference, *Rules and Regulations of The Southern California Intercollegiate Athletic Conference*, https://thesciac.org/documents/2026/7/31//v_1_SCIAC_R_R_2026_27.pdf?id=2642 (last visited Oct. 17, 2026).

huge recruitment tool."[15] Pomona College and Pitzer College opened a $57 million, 100,000-square-foot Center for Athletics, Recreation and Wellness "to support Pomona-Pitzer's 21-sport program, which earned its highest-ever finish among NCAA Division III programs with a No. 14 national ranking in the 2021–22 Learfield Directors' Cup."[16]

22. And Claremont McKenna College recently executed a capital campaign for a new "Sports Bowl" serving the combined Claremont-Mudd-Scripps athletics program, soliciting $25 million for naming rights to the Sports Bowl, $2.5 million for a softball field, and $2 million each for the baseball and softball stadiums (as well as $500,000 for each of the respective press boxes).[17]

23. These capital investments are the means through which the cartel permits its members to compete, and the schools pass the cost of that competition along to students through rapidly escalating tuition. Competition on price through athletic scholarships, which would better serve athletes by reducing their debt at graduation, is strictly forbidden.

24. The NCAA and its members may say that these programs generate no revenue and therefore merit no labor market. But the label "non-revenue generating" is equally apt for an English department or a janitorial staff. No media rights offset the cost of Introduction to Shakespeare, and a university cannot sell tickets to a clean restroom. Universities fund those departments anyway, because they produce institutional value in forms other than gate receipts, and no sane person would

---

[15] *See* Robyn Norwood, *Smashing Success*, Chapman Newsroom (Nov. 29, 2017), https://news.chapman.edu/2017/11/29/smashing-success/; Chapman Univ., *Erin J. Anderson '88 Tennis Center*, https://www.chapman.edu/support-chapman/areas-of-giving/inspire-campaign/anderson-tennis-center/index.aspx.

[16] *See* Pomona Coll., *New Center for Athletics, Recreation and Wellness Opens its Doors* (Oct. 14, 2022).

[17] *See* Claremont McKenna Coll., *Roberts Campus Sports Bowl*, https://www.cmc.edu/giving/investing-in-future-leaders/roberts-campus-sports-bowl.

hesitate to condemn an agreement among a thousand schools to fix, let alone eliminate, the wages of professors or janitors.

25. Moreover, the notion that Division III athletics is categorically non-revenue generating is becoming increasingly difficult to sustain as several Division III conferences now sell streaming rights to their contests in seven-figure media-rights agreements, a trend one observer describes as "rewriting the Division III media landscape," and the platform behind those deals has committed an additional $50 million to streaming rights, production, and marketing.[18]

26. This growing market for streaming Division III athletic competitions simply highlights a longstanding truth: Division III athletic programs are assets. Schools, despite their non-profit status, are not pure charities. They do not build eight-figure athletic palaces out of the goodness of their hearts. They build them in response to market dynamics, as amenities they deploy to compete for students, the same way they deploy theatre departments, laboratories, and dormitories. And when these schools want particular students, they pay for them, through merit aid for strong academics who will enrich their chemistry and history departments and

---

[18] The Landmark Conference entered the first seven-figure, conference-wide media-rights agreement in Division III, a transaction the University of Pennsylvania Graduate School of Education describes as a model for how conferences can increase both "visibility and revenue" and as part of a trend in which streaming rights are "rewriting the Division III media landscape." Univ. of Pa. Graduate Sch. of Educ., *The New Athletics Enterprise: Leadership, Risk, and Institutional Strategy* (2026). The Southern Collegiate Athletic Conference followed with a five-year, seven-figure FloSports agreement covering all live and on-demand contests of participating members and all eighteen conference championships, with 100% of the revenue reinvested in member institutions. FloSports, *Southern Collegiate Athletic Conference (SCAC) and FloSports Partner for Multi-Year Media Rights Agreement* (July 11, 2024). In 2025, the Little East Conference signed an exclusive five-year, seven-figure agreement under which more than 1,000 events per year would be distributed through FloCollege. Little E. Conf., *Little East Conference Secures Five-Year Media Rights Agreement with FloSports* (Apr. 3, 2025). By May 2026, the Southern Athletic Association had become the twelfth Division III conference to enter a FloCollege media-rights partnership. S. Athletic Ass'n, *Southern Athletic Association and FloSports Announce Exclusive Media Rights Partnership* (May 12, 2026). FloSports has announced an investment of more than $50 million in FloCollege to support conference rights fees, production, technology, content, and marketing. FloSports, *FloSports Launches FloCollege on October 15—A New Home for College Sports Featuring More than 12,000 Live Games Across Division I, Division II, and Division III* (Sept. 24, 2024).

targeted scholarships for marching band, theatre, and debate. There is no limit to the types of scholarships schools will offer to compete for enrollment, and, in recent years, there are well-documented examples of Division III colleges offering admission to students who did not even apply to the school to entice enrollment.[19] Only the varsity Division III athlete—whose labor will help recruit the next crop of enrollees—is barred from receiving a discount for that labor. By comparison, where "***[s]cholarships are available***" for activities like "gospel choir, marching band, music (other than marching band), and ***non-NCAA DIII collegiate sports including boxing, cheer and bowling***,"[20] schools eagerly market that students are "able to receive scholarship for [their] skills."[21]

27. The challenged rules fall particularly hard on women, restricting schools' ability to compete through athletic scholarships for an expanding pool of female athletes. Women accounted for approximately 57% of U.S. undergraduates in fall 2024 yet received only 42.5% of NCAA championship-sport participation opportunities in 2024–25. Girls' high school sports participation reached a record 3.65 million in 2025–26—more than twelve times the 294,015 recorded in 1971–72. Yet the financial incentives governing college athletics remain heavily weighted toward men's sports. The NCAA's 2026 distribution budget allocates approximately $237 million to its men's basketball funds, compared with $15 million to the corresponding women's funds, while the separately operated College Football Playoff distributes hundreds of millions of additional dollars to FBS conferences. Divisions II and III, meanwhile, receive constitutionally fixed shares of NCAA operating revenue—4.37% and 3.18%, respectively—within a system that restricts

---

[19] *See, e.g.*, Roshan Fernandez, *Hundreds of Colleges Are Sending Acceptance Letters to Kids Who Didn't Even Apply*, Wall St. J. (Sept. 3, 2026), https://www.wsj.com/us-news/education/hundreds-of-colleges-are-sending-acceptance-letters-to-kids-who-didnt-even-apply-21d37dd9 (reporting that Kalamazoo College adopted direct admissions through EAB's Match platform).

[20] *See* Olivet Coll., *supra* note 9, at 20 (emphasis added).

[21] *See* The Univ. of Olivet, *supra* note 10.

their members' freedom to compete or exit. Against this backdrop, women's share of Division III championship-sport participation opportunities *actually fell* from 42.2% in 2001–02 to 40.4% in 2024–25, even as women's proportion of the overall applicant pool skyrocketed. The Division III athletic aid prohibition contributes to this reduced output by preventing Division III schools from competing for female athletes through athletic scholarships and burdening efforts to expand scholarship opportunities in individual sports with the cost of meeting broader divisional requirements.

28. The athletic aid prohibition, entrenched by the classification conditions, guaranteed distributions, and scheduling restrictions and enforced by the threat of the NCAA's "death penalty," fixes the price of athletic labor and suppresses output of athletic scholarships. Because this conduct is facially anticompetitive, *i.e.*, it produces clear anticompetitive effects and offers no procompetitive benefits, it is a naked restraint on trade that should be deemed illegal per se.

29. Even if Defendant's conduct somehow benefited competition and furthered consumer welfare in some minimal way (it does not), the conspiracy's anticompetitive effects would vastly outweigh any benefits to Plaintiffs and the proposed class and should thus also be swiftly condemned under the Rule of Reason.

30. Plaintiffs bring this action on behalf of themselves, a damages class of current and former Division III athletes, and an injunctive class of current and future Division III athletes to recover all monetary and injunctive relief available under federal antitrust law.

///

///

///

///

# II. PARTIES

## A. Plaintiffs

### Connor Printz

31. Plaintiff Connor Printz is a resident of Hermosa Beach, California. He grew up in Waterbury, Connecticut, enrolled at Claremont McKenna College in Claremont, California, in the fall of 2020, and graduated in May 2024 with a bachelor's degree in psychology. While enrolled, he played guard for the Claremont-Mudd-Scripps ("CMS") men's basketball team, which competes in NCAA Division III and the SCIAC. CMS did not compete during his first academic year because of COVID-19. Printz competed in the 2021–22 and 2022–23 seasons and remained with the team into the beginning of the 2023–24 season.

32. Before college, Printz played basketball at the Taft School in Connecticut and completed a postgraduate year at Deerfield Academy in Massachusetts. He was a 1,000-point scorer, served as a team captain in three seasons across Taft and Deerfield, and earned team most valuable player honors. He received All-New England Preparatory School Athletic Council honorable-mention recognition and was nominated for the McDonald's All-American Game.

33. Printz's athletic ability drew recruiting interest from Division III colleges across the country, including CMS, New York University, Washington University in St. Louis, the University of Chicago, Amherst, and Williams. He chose Claremont McKenna for its academic and other opportunities, its basketball program, and its location in California. Every Division III program competing for his services was subject to the same prohibition on athletic scholarships.

34. Claremont McKenna awarded Printz no athletic scholarship. He relied on substantial educational borrowing to attend the college. For the 2022–23 academic year, the college's published tuition, fees, room, and board totaled

$79,427.[22] The challenged agreement prevented the college from offering an athletic scholarship to reduce his educational costs in return for his athletic services.

35. Beginning in his junior year, Printz also earned money producing social-media content and entering endorsement arrangements with brands including Reebok and Clif Bar that totaled approximately $50,000 during his time in college. He obtained those opportunities while still enrolled and playing basketball.

36. Early in the 2023–24 season, Printz left the basketball team to devote more time to his social-media business. With even just a meaningful partial scholarship, Printz would have continued playing through his senior season because his basketball labor would have served to cover a part of the cost of his education. The challenged prohibition, however, foreclosed any such athletic aid offer and reduced his incentive to continue supplying athletic services.

37. On information and belief, absent the challenged agreement, Claremont McKenna would have competed for Printz's athletic services by offering athletic aid, and he would have received aid that reduced the net cost of his education. The agreement instead required the college to award no athletic aid regardless of his recruiting alternatives or the value of retaining him on its team. Printz seeks damages for that suppression of compensation during the Damages Class period.

**Chris Jennings**

38. Plaintiff Chris Jennings is a resident of Tampa, Florida. He attended the University of Lynchburg in Lynchburg, Virginia, where he earned his undergraduate degree in May 2022 and a Master of Business Administration in May 2024. Jennings competed on Lynchburg's men's lacrosse and swimming teams, which compete in NCAA Division III and the Old Dominion Athletic Conference ("ODAC"). His final

---

22 *See* Claremont McKenna Coll., Fact Sheet 2022–2023, https://www.cmc.edu/institutional-research/fact-sheet/2022-2023.

season of intercollegiate competition was the 2022–23 season, when he remained enrolled at Lynchburg as a graduate student.

39. Jennings was an accomplished athlete before arriving at Lynchburg. At Jesuit High School in Tampa, he was a three-time state champion and 14-time medalist in swimming, while gaining multiple regional player of the week recognitions on the lacrosse field. He also served as a captain and earned team most valuable player honors in lacrosse.

40. Lynchburg recruited Jennings to play lacrosse, as did peer Division III schools like Washington and Lee and Stevenson. He chose Lynchburg because he wanted to compete for conference and national championships and valued the quality of its lacrosse program. Those Division III schools could compete for his enrollment through the athletic opportunities they offered, but the challenged agreement prevented them from offering an athletic scholarship.

41. When Lynchburg restored varsity swimming for the 2019–20 season, Jennings joined the team and became a two-sport varsity athlete. From 2019–20 through 2022–23, he earned All-ODAC recognition across multiple events in four consecutive swimming seasons. He also earned Academic All-District recognition in 2023. His contributions helped Lynchburg build a competitive swimming program: in January 2023, he helped the team defeat ODAC rival Roanoke College for the first time and set Lynchburg's dual-meet record in the 100-yard breaststroke.

42. Lynchburg awarded Jennings no athletic scholarship for his participation on either of its teams. During the 2022–23 academic year, he worked in the University's Academic Achievement Resource Center to help pay for his graduate classes. His athletic ability and contributions to Lynchburg's teams could not qualify him for an athletic scholarship or other aid based on athletic participation. For the 2020–21 academic year, Lynchburg's tuition, fees, room and board, and

other expenses totaled $53,048.[23] After Jennings's eligibility expired with the conclusion of the 2022–23 season, he accepted a position as a graduate assistant coach for the swim team and received financial aid that covered approximately half of his tuition, aid that had been foreclosed to him as an athlete.

43. On information and belief, absent the challenged agreement, Lynchburg would have competed for Jennings's continued athletic services by offering athletic aid, and Jennings would have received aid that reduced the net cost of his education. Instead, the NCAA and its co-conspirators prohibited Lynchburg from providing Jennings with any athletic aid, regardless of the value of his contributions. Jennings seeks damages for the resulting suppression of compensation for his athletic services during the Damages Class period.

**Jackson Hale**

44. Plaintiff Jackson Hale is a senior at Pacific Lutheran University ("PLU") in Tacoma, Washington, where he studies biology and serves as a captain of the football team during the 2026 season. He is from Mead, Washington, and has played football for PLU since 2023. PLU competes in NCAA Division III and the Northwest Conference ("NWC").

45. At Mount Spokane High School, Hale earned nine varsity letters across football, wrestling, and track and field. He received All-League recognition as a linebacker and Defensive MVP honors, was named the Greater Spokane League's Spring Athlete of the Year, and twice won a state championship in the 4-by-400-meter relay. Hale was recruited by Linfield University and PLU, ultimately choosing to attend PLU.

---

[23] *See* Univ. of Lynchburg, 2020–2021 Undergraduate Catalog 295 (2020), https://www.lynchburg.edu/wp-content/uploads/2020/10/undergraduate-catalog-2020-2021-rev-10-6-2020.pdf.

46. Hale has developed into one of PLU's leading defensive players. He was awarded special teams player of the year for PLU his freshman year. In 2025, he appeared in all ten games, recorded 63 tackles, including 6.5 tackles for loss and three sacks, and earned Second Team All-NWC honors. In November 2025, he also earned the conference's Defensive Student-Athlete of the Week award after returning an interception 40 yards for a touchdown against Lewis & Clark. He continues to compete for PLU during the 2026 season. Hale has also earned modest compensation through NIL opportunities secured independently of PLU.

47. Hale has incurred substantial educational expenses to attend PLU and has relied on significant student loans to finance his education. For the 2026–27 academic year, PLU's estimated cost of attendance totals $69,668 for students who enrolled before the 2025–26 academic year.[24] On information and belief, absent the challenged agreement, PLU would have competed for Hale's athletic services by offering athletic aid, and he would have received aid that reduced the net cost of his education.

48. The challenged agreement prohibits PLU from offering Hale an athletic scholarship. PLU expressly states on its website—under the subpage titled First Year Scholarships and Grants—that, "as an NCAA DIII school, PLU cannot take into consideration athletic participation when awarding its own scholarship and grant assistance."[25] This disclaimer appears next to advertisements for automatic scholarships of $1,000 per year for "student[s] who are dependents of PLU alumni (this includes step-parents)" and awards ranging from $1,000–$7,500 for "[e]xceptional ability in the fields of art & design, dance, media, music, and theatre (acting & technical)." And because Bylaw 15.01.3 also bars aid based on "athletics

---

[24] *See* Pac. Lutheran Univ., *2026–27 Cost Information*, https://www.plu.edu/financial-services/students/cost/2026-27-cost-information-2/.

[25] *See* Pac. Lutheran Univ., Scholarships & Grants, https://www.plu.edu/financial-services/students/financial-aid/types-of-aid/scholarships-and-grants/.

leadership," PLU cannot recognize the leadership Hale provides as a team captain, even though leadership in non-athletic activities may be rewarded. While Hale remains enrolled and competing for PLU, the prohibition prevents the University from offering similar aid in exchange for his continued athletic services. Hale seeks to represent the Injunctive Class to remove that prohibition and the restraints that entrench it, restoring competition for his services and those of other current and future Division III athletes.

**B. Defendant**

49. Defendant National Collegiate Athletic Association ("NCAA") is an unincorporated association headquartered in Indianapolis, Indiana. The NCAA comprises approximately 1,100 member colleges and universities organized into three divisions. It promulgates, administers, and enforces the constitution and bylaws containing the restraint challenged here, distributes the guaranteed revenue shares alleged below, and transacts business throughout the United States, including in this District, where numerous member institutions are located.

**C. Co-Conspirators**

50. Every NCAA member institution and every NCAA member conference in all three divisions that adopted, implemented, or enforced the challenged agreement and is not named as a Defendant is alleged to be a co-conspirator with Defendant in the alleged anticompetitive conduct and to have performed acts and made statements in furtherance thereof.

## III. JURISDICTION AND VENUE

51. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

52. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and Section 12 of the Clayton Act, 15 U.S.C. § 22. A substantial part of the events giving

rise to the claim occurred here. The SCIAC, which counts CMS among its membership, is headquartered in this District and administers the Division III rules among its members, every one of which is in this District. The NCAA enforces the challenged athletic aid prohibition against institutions and athletes here, and the agreement suppresses athletic aid for services supplied here, including by Plaintiff Connor Printz while attending Claremont McKenna College in Claremont, California. The national agreement's implementation in this District forms a substantial part of the conduct and injury at issue.

53. This Court has personal jurisdiction over the Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Cal. Civ. Proc. Code § 410.10. The NCAA and its member schools and conferences regularly transact business in this District and direct the challenged conduct at institutions and athletes located here. The NCAA's member conferences participate in the Association-wide agreement alleged herein, send their member institutions' teams into California to compete against California institutions in regular-season contests and NCAA championships administered under the challenged rules, and derive value from the national scheduling and championship network those rules create.

## IV. <u>FACTUAL ALLEGATIONS AND LEGAL BACKGROUND</u>

### A. History of Amateurism and Restraints on Athletic Aid

54. College athletics did not begin with the NCAA, and a competitive market for athletic talent is the natural state of American higher education. The Morrill Land Grant College Act of 1862 triggered a wave of university construction and, with it, an unprecedented enrollment arms race. For the first time, American colleges held a genuine excess supply of seats that needed to be sold, and intercollegiate sports came to be seen as central to promoting a college to prospective applicants. Athletics served the schools twice over: as an amenity giving students a

reason to enroll and as a promotional engine, a tool to raise the institution's profile, attract donor funds, and draw additional students.

55. Long before the NCAA's formation, colleges, and especially the most selective among them, offered all manner of compensation to talented athletes. As Justice Gorsuch recounted for a unanimous Court in *Alston*, the schools that would become the Division III membership and the Ivy League (which maintains its own conference-level prohibition on athletic aid inside Division I)[26] lured athletes with covered tuition, free meals, luxury trips, the exclusive right to sell scorecards at games (an early form of the revenue sharing now permitted in Division I), and cushy jobs as agents for prominent tobacco companies. *Alston*, 594 U.S. at 75. The future flagbearers of Division III behaved no differently. The University of Chicago, which would eventually join Division III and pledge itself to the non-scholarship model, created an $80,000 trust fund, roughly $2.86 million in today's dollars, earmarked for recruiting and subsidizing athletes. Where the anticipated institutional return exceeded the cost to educate the athlete, schools competed for that return the way businesses compete for any valuable input, on price.

56. The point of this history is not nostalgia. It is that NCAA Division III Bylaw 15.01.3 is the product of coordinated suppression of a once-thriving market, not of any organic institutional preference. The schools now bound by the Division III prohibition were once among the most aggressive spenders in the market.

[26] The Association permits the Ivy League to preserve a non-scholarship identity inside Division I, where the Ivy schools compete against, and frequently beat, institutions that now face no scholarship caps at all. The same NCAA and conference stakeholders who defend the Ivy League's right to remain non-scholarship at the Division I level, and who point to that coexistence as proof that scholarship and non-scholarship programs can share a division, cannot plausibly insist that MIT's independently chosen $500 tuition reduction for a field hockey goalie would bring Division III to its knees. If the Ivy League's adherence to a no-aid policy does not upend competition within Division I, there is no rational explanation for why allowing self-selecting Division III schools to give aid would upend Division III.

57. In 1905, President Theodore Roosevelt's son broke his nose in a Harvard football game. Alarmed by the injury and by a rising death toll—eighteen players were killed on the field that year alone—Roosevelt summoned the presidents of Harvard, Princeton, and Yale to the White House to address the increasing lethality, and popularity, of college football. That meeting led to the creation of what is now the NCAA.

58. The organization's original purpose was modest, limited to the on-field rules of football and particularly to safety. The fledgling association reported $28.82 in total assets a year into its existence, and for the next five decades it functioned as a cross between a safety-standards body and a debating society, abiding by a "home rule" principle under which each school chose which recommendations to implement. Even so, the nascent trade association could not refrain from opining on the rising cost of labor, cautioning in its 1906 bylaws that no student should represent a college in any intercollegiate contest "who is paid or receives, directly or indirectly, any money, or financial concession."

59. Despite the NCAA's hand-wringing, colleges kept paying for athletic labor. One 1920s coach estimated that a rival was spending over $200,000 a year on players, roughly $3.79 million today. The Carnegie Foundation's infamous 1929 report lamented the "pecuniary and other inducements" dangled before boys to entice them to enter a particular college, but a follow-up New York Times survey two years later found that not a single college had changed its tactics.

60. The NCAA formally entered the aid fixing business with the "Sanity Code" in 1948, reiterating its opposition to "promised pay in any form" while, for the first time, expressly authorizing member schools to cover athletes' tuition and incidental expenses so long as the aid was need-based. The Code also created the NCAA's first enforcement mechanism, providing for suspension or expulsion of offenders. The Sanity Code collapsed almost immediately. In 1951, the membership

voted to repeal it rather than expel the "Sinful Seven" (Villanova, Maryland, Boston College, Virginia, Virginia Tech, The Citadel, and VMI), which had ignored the need-based requirement.

61. In 1955, Ray Dennison, a scholarship lineman at Fort Lewis A&M, died after his skull was crushed in a football game, and his widow filed a workers' compensation claim. To defeat it, the NCAA needed a theory recasting the relationship between player and school as something other than employment. The response, as the NCAA's first full-time executive director Walter Byers later admitted in his memoir, was the crafting of the term "student-athlete," which the NCAA immediately embedded in all its rules and interpretations. Emboldened by the insulation that newly contrived label promised, the NCAA passed rules expressly permitting, for the first time, non-need-based athletic aid.

**B. Creation of the Division System**

62. In 1973, the same year it mandated single-year scholarships, the NCAA formally divided its membership into the three divisions through which it operates today. Division I historically imposed the highest per-sport caps on athletic aid, caps now largely moot after the *House* settlement. Division II permits athletic scholarships at lower maximums than the old Division I caps. Division III prohibits athletic scholarships entirely. Five years later, in 1978, the NCAA further subdivided Division I into what are now the Football Bowl Subdivision ("FBS"), the Football Championship Subdivision ("FCS"), and Division I Non-Football.

63. Membership in each tier carries mandatory capital commitments. FBS rules require sixteen sponsored sports and establish phased aid minimums of 90% of applicable scholarship limits, 210 athletics grants, and $6 million in annual aid, with the revised thresholds taking effect August 1, 2027, for existing members. NCAA Div. I Bylaws 20.9.9.1–.3. FCS and other Division I institutions generally must sponsor at least fourteen sports and satisfy separate aid minimums. *Id*. 20.9.3.1,

20.9.6, 20.9.10.1. Division II schools must sponsor at least ten sports and satisfy a minimum-aid requirement through one of several alternatives, including 50% of the maximum allowable equivalencies in four sports, twenty full-equivalency grants, or $250,000 in athletics-related aid. NCAA Div. II Bylaws 7.3.1.6.1, 7.3.1.7. Division III schools must sponsor at least ten sports, or twelve if enrollment exceeds 1,000, and may not award a dollar of athletically related aid in any of them. NCAA Div. III Bylaws 15.01.3, 20.11.4.1–.2.

64. In addition to the sponsorship minimums, a member must play a prescribed share of its schedule against opponents drawn from a designated NCAA division. FBS schools must play at least 60% of their football games against FBS opponents, NCAA Div. I Bylaw 20.9.9.2, and Division I imposes sport-specific requirements that force substantial portions of schedules against Division I opponents. *Id*. 20.9.7–.8. Division III also conditions at-large championship selection on divisional scheduling. In team sports other than golf and tennis, at least 50% of scheduled regular-season contests must be against an active, provisional, or reclassifying Division III institution in an institution's region. NCAA Div. III Bylaws 31.3.2, 31.3.2.2. Division III lowered that threshold from 70% to 50% for most team sports through Proposal No. 2026-4, adopted at the January 2026 NCAA Convention; for most of the Damages Class period, the requirement was 70%. A contest against an opponent from another college athletic association—such as the NAIA—does not satisfy that requirement. Sponsorship minimums tell a school how many teams it must field. The scheduling rules tell it whom those teams may play. Together they discipline any contemplated individual or mass exit from the NCAA.

65. The divisional structure also once contained a path for targeted investment the NCAA has since blocked. Under the Association's former multidivisional classification rules, a school could elevate a single program to a higher division. Hobart College, which won thirteen of the first fourteen Division III

men's lacrosse championships, elevated its lacrosse program alone to Division I in 1995 through exactly that pathway. The NCAA subsequently eliminated the pathway, grandfathering only those programs already elevated. Today, absent a grandfathered classification, a Division III institution that wishes to offer even the modest scholarship equivalencies available in Division II in just a single sport must first undertake the broader sponsorship and aid commitments of higher-division membership, including at least ten sponsored sports in Division II. The NCAA's own published Division II expense data imply that satisfying those minimums costs millions of dollars annually. In other words, providing a $500 athletic scholarship to one soccer player is conditioned on a school investing millions in other NCAA products.

### C. Divisions II and III Surrender "One-Institution, One-Vote" Governance in Exchange for Guaranteed Payments of Division I-Generated Revenue

66. Before 1997, the NCAA operated on a one-institution, one-vote basis, with legislation of constitutional importance requiring approval by two-thirds of the full membership regardless of division. In 1997, using the threat that FBS institutions would leave the NCAA, the Association reorganized itself along openly plutocratic lines. Three features of that reorganization were particularly important for preserving the NCAA's role as a monopsonist.

67. First, the reorganization guaranteed FBS schools, which today number just 138 of the NCAA's nearly 1,100 member institutions, 50% of all voting positions on the NCAA Executive Committee, the body with sole power to call for a two-thirds vote of the full membership to overturn the action of any division. Second, it codified in the NCAA Constitution, for the first time, Division II's and Division III's right to guaranteed minimum shares of preexisting NCAA revenue, fixed at 4.37% and 3.18% respectively "of all operating revenue sources, as agreed

on January 9, 1996," a guarantee the operative Constitution carries forward today. NCAA Const. art. 3(A). Third, it gave the FBS the exclusive right to revenue from any future football subdivision championship, the asset that became the College Football Playoff, which the FBS conferences now own outright through CFP Administration, LLC, and which is expected to generate well over a billion dollars in 2026 alone.

68. Because nearly two-thirds of the NCAA's operating revenue base is traceable to a single contract, the domestic broadcast agreement for the Division I men's basketball tournament known as March Madness, and much of the remainder likewise flows from other Division I championship products, the lower divisions' guarantee is, in economic substance, a share of March Madness. The lower divisions' own championships contribute no material revenue to the pool.

69. In functional terms, the 1997 reorganization was an intracartel settlement. The dominant tier agreed to pay smaller schools a guaranteed annuity drawn from a product those schools do not help produce, in exchange for their surrender of governance, their continued adherence to the aid restrictions that anchor the Association's tiered wage structure, and their continued service as the rhetorical shield for the top tier's preferential tax and antitrust treatment.

70. The membership data are consistent with a structure calibrated to exactly that end. NCAA membership has grown from roughly 800 schools in 1989 to nearly 1,100 today, with few if any examples of institutions leaving the Association entirely. The growth has been concentrated in Division III, which was roughly equal in size to Division I in 1989 and has since expanded roughly 50% faster than Division I, making it the NCAA's largest division by a substantial margin.

///

///

**D. The Division III Athletic Aid Prohibition Is an Illegal Horizontal Agreement to Fix the Price of Division III Athletic Labor at Zero**

71. NCAA Division III Bylaw 15.01.3, which provides that a member institution "**shall not award financial aid to any student on the basis of athletics leadership, ability, participation or performance**," is a written horizontal agreement among competing buyers of athletic labor to fix the price of that labor at zero. NCAA Div. III Bylaw 15.01.3 (emphasis added). And every NCAA member, across all three divisions, commits to honor and enforce the Division III athletic aid fix through the NCAA Constitution, agreeing that college athletes may only be compensated by a member institution for participating in a sport "**in accordance with guidelines established by their NCAA division**." NCAA Const. art. 1(B) (emphasis added).

72. The Division III prohibition operates within the Association-wide framework described above. NCAA Constitution Articles 1(B) and 4(A) establish divisional rules regarding athletic aid and require members to comply with adopted rules. The 2026–27 Division III Manual reinforces Bylaw 15.01.3 through Bylaw 15.01.4, which requires aid packages to be consistent with institutional policies for all students (regardless of their labor contributions as athletes). Specifically, Bylaw 15.3.1(a)–(c) prohibits any consideration of athletics criteria in determining total aid offered, requires that aid to athletes be awarded through the same procedures the institution uses for all students, and mandates that the resulting package not be "clearly distinguishable from the general pattern" of aid at the institution. Bylaw 15.01.6 prohibits donors from contributing funds to provide financial aid specifically for student-athletes, while Bylaw 15.01.7 prohibits a school from incorporating athletic aid into its budget. Bylaw 15.01.2 extends the consequences to the athletes themselves, placing their eligibility at risk if they receive improper aid. These

provisions operate together to prevent an institution from bidding openly for Division III athletic services with financial aid.

73. Active Division III members must administer their athletics programs in accordance with the NCAA Constitution, bylaws, and other Association legislation, *id*. 20.8.1.2, and must comply with all applicable rules of the Association, their division, and their conference, monitor compliance, report violations, and cooperate with enforcement. *Id*. 20.15.1–.2. Each Division III conference imposes the same obligations on its members as a condition of conference membership.

74. The prohibition is uniform, mandatory, and continuously enforced. It is republished annually in the Division III Manual, and fealty to it remains enshrined year over year in the NCAA Constitution. Adherence is monitored through financial-aid reporting rules designed to detect whether athletes receive disproportionate institutional aid. And it is backed by the Association's full sanctioning power, including the authority to terminate an offending athletic program through the death penalty. While that sanction is popularly associated with big-time Division I scandals, its only modern deployment was against a Division III school handing out modest tennis scholarships.

75. In 2005, the NCAA banned MacMurray College's Division III men's tennis program for two seasons because its head coach had arranged for his father to fund more than $162,000 in aid for ten of its players over four years, the first use of the sanction in eighteen years. By contrast, in 2017, a Division I flagship institution implicated in a decades-long academic-fraud scandal involving athletes in faux-college courses escaped institutional sanction altogether. Enforcement of the aid prohibition remains active today. In January 2026, the NCAA placed the University of Lynchburg—where Plaintiff Jennings competed—on probation, publicly reprimanded it, and fined it because, in the 2022–23 academic year, athletes received

a disproportionate share of institutional gift aid awarded through an academic scholarship competition, leaving their packages "clearly distinguishable from the general pattern" of aid, and because an assistant coach had asked the admissions office whether more aid could be offered to a recruit. NCAA Div. III Comm. on Infractions, Univ. of Lynchburg, Case No. 020354 (Jan. 23, 2026) (negotiated resolution).

76. Each Division III member is an independent economic actor, an actual or potential competitor of every other Division III member in the market for athletic labor. Each has agreed with the others, through the machinery of the NCAA and its member conferences, on the price it will pay for that labor—$0. In any other industry, an agreement among 400 competitors to pay nothing would be prosecuted, not administered.

77. The agreement's effect does not depend on inference. Every other college athletic association or NCAA division that permits athletic aid distributes it, at per-athlete levels detailed below, and the one tier that distributes nothing is the one tier whose governing documents forbid it.

| Association | Average Annual Athletic Aid Per Athlete |
|---|---|
| NCAA Division I | ~$20,665 |
| NAIA | ~$9,455 |
| NCAA Division II | ~$7,290 |
| NCAA Division III | $0 |

## E. Other NCAA Bylaws Entrench the Athletic Aid Fixing Conspiracy

### *1. All-or-Nothing Classification Requirements Burden Targeted Scholarship Investment*

78. A Division III institution cannot respond to demand for one scholarship sport simply by elevating that program. Division III Bylaws 20.1.1 and 20.4 govern institutional and multidivisional classification. Division I Bylaw 20.5.1 restricts Division I classification for Division II and III sports to those already so classified in 2010–11, subject to the opposite-gender pathway in Bylaw 20.5.1.1[27] and other narrow exceptions.

79. For institutions outside those pathways, reclassification entails compliance across an entire athletics program. Division II Bylaw 7.3.1.7 ordinarily requires ten sports for a coeducational program. Division I Bylaw 20.9.6 ordinarily requires fourteen, and Bylaw 20.9.9.1 requires sixteen for FBS. Division III itself requires ten or twelve sports depending on enrollment under Bylaws 20.11.4.1–.2.

80. The sponsorship requirements are distinct from the minimum-aid requirements, but the two work together to entrench the aid fixing conspiracy by making reclassification from Division III to Division II or Division I onerous. Division II Bylaw 7.3.1.6.1 permits alternative aid benchmarks: half of allowable scholarship equivalencies in four sports, twenty full equivalencies in the aggregate, or $250,000 in athletics aid. Division I Bylaw 20.9.3.1 imposes separate alternative aid minimums for non-FBS members, and Bylaw 20.9.9.3 sets FBS aid minimums.

81. The cheaper of the two routes out of Division III, Division II, shows what the all-or-nothing structure produces in practice. A Division III college that wants to award a single athletic scholarship must first secure an invitation from a

[27] This bylaw provides that a "member of Division II or Division III that had one sport classified in Division I during the 2010–11 academic year may petition to have one sport of the opposite gender, other than football or basketball, classified as Division I, provided the original sport remains classified in Division I."

Division II conference, pay the Association's application and membership-process fees, and serve a provisional period of at least three years during which its teams are ineligible for NCAA championships. Additionally, it must sponsor at least ten sports that satisfy Division II's content and participant minimums. By its second provisional year, the applying school must commit to fund athletic aid at Division II's floor of at least $250,000 per year. NCAA Div. II Bylaws 7.3.1.6.1, 7.3.1.7. Indeed, when Sul Ross State University applied to move from Division III to Division II beginning in 2024, earmarking $250,000 for scholarships was a condition of the application. And when the University of Texas at Dallas completed the same move, it awarded 218 athletes $2.8 million in athletic aid in the 2025–26 academic year, aid that, as the University of Texas System's auditors put it, "is prohibited in Division III schools."[28] Elevation to Division I is costlier by an order of magnitude. A Division I member must sponsor at least fourteen sports and must satisfy an athletic aid minimum expressed as either (i) half of the maximum allowable grants in fourteen sports, (ii) an inflation-adjusted aggregate expenditure of approximately $2 million, or (iii) at least fifty full grants. NCAA Div. I Bylaws 20.9.3.1, 20.9.6.[29]

---

[28] *See* NCAA, *2027 Division II Membership Application Instructions* (application fee of $33,000, an additional $14,000 for the membership process and annual dues, a provisional period of at least three years, and compliance with Bylaw 7.3.1.6.1 by the second provisional year); NCAA, *Becoming a Division II Member Institution*, https://www.ncaa.org/governance/becoming-division-ii-member-institution (conference membership required; provisional members ineligible for championships); U.S. Gov't Accountability Off., GAO-26-108640, *College Athletics: Most Programs Spend More Than They Generate in Revenue* 13 (July 14, 2026) (median Division II program spent $8.5 million in 2023–24, about one-third on scholarships), https://www.gao.gov/assets/gao-26-108640.pdf; Sul Ross State Univ., *SRSU Applies to Move to NCAA Division II*, https://www.sulross.edu/srsu-applies-to-move-to-ncaa-division-ii/; Univ. of Tex. Sys. Audit Office, *UTD Athletic Scholarships Report*, Rep. No. 2616 (June 15, 2026), https://utsystem.edu/sites/default/files/documents/ut-system-reports/2026/utd-athletic-scholarships-report/utd-athletic-scholarships-report.pdf.

[29] The Division I exemption from the aid minimums for institutions that awarded no athletically related aid as of January 11, 1991, NCAA Div. I Bylaw 20.9.3.1.6, does not open a non-scholarship path for a reclassifying Division III school. When the University of California, Davis sought to move to Division I without scholarships in 1992, the NCAA's interpretations committee ruled that the exemption applied only to institutions already in Division I, and the NCAA Council declined to overrule it, explaining that "all Division I members must provide scholarships." Univ. of Cal., Davis, *NCAA Council Nixes UC Davis Appeal to Move to Division I Without Scholarships* (Aug. 11, 1992), https://www.ucdavis.edu/news/ncaa-council-nixes-uc-davis-appeal-move-division-i-without-

82. The Division I Council adopted new reclassification rules in January 2025 that make the scholarship commitment even more onerous. A Division III institution seeking to reclassify must have been an active Division III member for the preceding five years, already satisfy Division I's minimum sports-sponsorship requirements, secure a bona fide membership offer from an active Division I multisport conference, and demonstrate its intent to comply with Division I's financial-aid minimums during the first year of a four-year reclassification process. Before attaining *active* Division I membership, the institution must satisfy additional financial-aid requirements, including awarding scholarships or scholarship equivalencies exceeding the tenth percentile of active Division I members. NCAA Div. I Bylaw 20.6; NCAA Div. I Proposal No. 2024-66 (adopted Jan. 15, 2025). The application fee, set each year by reference to the value of Division I distributions, has been reported at roughly $1.7 million for recent applicants and $2 million for the most recent. A reclassifying school is ineligible for NCAA championships throughout the transition and does not begin receiving the Association's sports-sponsorship and grants-in-aid distributions until after its third year as an active member. And since August 2025, the Division I Board of Directors has imposed a moratorium on new reclassification applications from Division II and Division III institutions altogether, running until at least February 2027.[30]

---

scholarships. The reclassification criteria adopted in 2025, which condition exit from reclassification on minimum scholarship awards, confirm the point.

[30] NCAA Div. I Proposal No. 2024-66, *Division Membership — Change of Division Membership — Division II or Division III to Division I* (adopted Jan. 15, 2025), https://web3.ncaa.org/lsdbi/search/proposalView?id=108331; NCAA, *Division I Adopts New Reclassification Criteria* (Jan. 15, 2025), https://www.ncaa.org/news/2025/1/15/media-center-division-i-adopts-new-reclassification-criteria.aspx; NCAA, *Division I Member Schools*, https://www.ncaa.org/division-i/member-schools/ (describing the three- and four-year processes, the exit benchmarks, and the August 5, 2025 moratorium on new reclassification applications through February 2027). On the fee, *see* Alex Zietlow, *Queens Is Now One Year into Its Transition to Division I*, Charlotte Observer (2023) (fee "in the neighborhood of $1.7 million"), and WUWF, *UWF Athletics Moving to NCAA Division I* (Apr. 2, 2026) ($2 million entry fee), https://www.wuwf.org/local-news/2026-04-02/uwf-athletics-moving-to-ncaa-division-i.

83. A Division III college that concludes that a few partial wrestling or lacrosse scholarships would pay for themselves many times over in enrollment, donor support, and additional brand visibility therefore cannot buy that scholarship for its cost. It must buy an entire Division II or Division I athletics department, sport by sport and scholarship by scholarship, and forgo championships for years while it does so.

84. A school may have both the resources and the student demand to fund one team competitively but lack the resources or incentive to assume the broader divisional obligations. The resulting scholarship output is less than independent, sport-specific investment and a competitive market would produce.

85. Take, for example, the upstate New York lacrosse corridor. Nazareth has won three Division III men's national championships. SUNY Cortland has claimed two titles of its own. Hamilton's women's program won a national championship in 2008, and Rochester Institute of Technology ("RIT") has been a fixture of the Division III men's tournament's final weekend, winning back-to-back national championships in 2021 and 2022 and reaching the championship game in 2013, 2017, 2024, and 2026. It is implausible that these schools refrain from offering lacrosse scholarships because they have concluded their programs are not worth funding, or that athletic aid would yield no return in Four Benefits. Indeed, Hobart College, another elite lacrosse program in the region, reinforces this point, as its flagship Division III men's lacrosse program escaped to Division I through the formerly open pathway of multidivisional classification in 1995, which the NCAA has since opted to wall off.

86. The sustained national relevance of the elite Division III lacrosse programs in this region—paired with the reality of Hobart's one-off elevation—demonstrates that Division III institutions decline to offer athletic aid not because it is economically rational for them as individual institutions, but because the NCAA

forbids such targeted investment. Now that the multidivisional classification pathway once used by Hobart and others has been walled off, a Division III college that wants to offer $1 of athletic aid in just one sport must first commit to either (i) funding half the maximum scholarship equivalencies across at least nine other sports, (ii) granting at least 20 total full-equivalency grants, or (iii) spending at least $250,000 in athletically related financial aid in perpetuity. The same is true of a Division III school in the foothills of Appalachia that would build its identity around identifying overlooked baseball talent in one of the sport's hotbeds, or of a small Iowa college that sits amid the densest concentration of high school wrestling talent in the country and already fields a program that could, in all likelihood, outperform many Division I programs.

87. The NCAA's own architecture confirms that scholarship and non-scholarship choices can coexist within intercollegiate competition. Ivy League teams compete in Division I without athletic scholarships and have achieved success at the highest level, including NCAA national championships in men's lacrosse by Princeton in 2026 and Cornell in 2025, and in men's and women's fencing by Harvard in 2024. Grandfathered Division I programs offer aid on otherwise Division III campuses. The Patriot League expanded scholarship offerings sport by sport, including football scholarships beginning in 2013. Division I institutions now compete against one another with no scholarship caps at all. Division III institutions should have the freedom to make similar, independent decisions responsive to demand. That freedom would restore output that the current structure suppresses. In a functioning market, a school competing for students who value athletics as a near-dispositive amenity may compete in one of two ways, either by increasing the value the school provides as consideration for the athletes' labor through athletic scholarships or by improving the quality of the playing experience through facilities, staffing, and programming. The Division III regime forecloses the first channel

entirely, insulating members from price competition for athletes while permitting colleges to pass escalating athletic-facility expenditures through to the student body, athletes and non-athletes alike, via tuition and other institutional charges. The decision not to pay for athletic labor is not a market outcome. It is a decision imposed by a monopsonist with its own agenda.

#### *2. Guaranteed Revenue Distributions Secure Adherence to the Horizontal Restraint*

88. NCAA Constitution Article 3(A) guarantees Division II 4.37% and Division III 3.18% of Association operating revenue. The NCAA uses these distributions to buy adherence to the aid fixing agreement and forbearance from competing through another association.

89. These mandatory transfers preserve the lower divisions' stake in an Association whose rules suppress their ability to compete for athletes and deter collective movement to the NAIA or another rival. A rival gaining a meaningful share of Division III institutions could offer schools and athletes a competing system of scholarships, contests, and championships that could discipline the NCAA. The guaranteed distributions help prevent that competitive reorganization.

#### *3. NCAA Scheduling Rules Deter Departure*

90. Division III Bylaw 31.3.2 currently requires, for championship selection, at least 50% in-region regular-season competition in team sports other than golf and tennis, subject to waivers and exceptions. Bylaw 31.3.2.2 limits countable "in-region" competition to active, provisional, or reclassifying Division III opponents meeting its regional, geographic, or conference criteria. An NAIA opponent does not count toward that threshold. These requirements strip the value from an NCAA member's scheduling of a neighboring institution that leaves the NCAA, making it harder for a school departing the NCAA to cobble together a

schedule for its athletic programs. 2026–27 NCAA Division III Manual, Bylaws 31.3.2–31.3.2.3.

91. This is a collective agreement among competitors to deal only with one another on terms the Association sets. Suppose a Division III school concluded that the aid prohibition was not worth the March Madness annuity and resolved to leave for the NAIA. It would not merely forfeit its guaranteed distribution; it would also discover that its remaining opponents cannot schedule it without jeopardizing their own championship eligibility, and that its conference, itself composed of NCAA members bound by the same rules, cannot keep it. The departing school would have to rebuild schedules across every sport it sponsors from the far smaller set of institutions outside the Association and within a plausible travel radius. This rule makes exiting the NCAA so cost prohibitive that no rational athletic director would pay to do so.

92. The minimum aid requirements, scheduling rules, and guaranteed distributions all deter exit from the Association and movement within it, thereby entrenching the aid fixing conspiracy. Together they help explain why more than 400 sophisticated and otherwise fiercely competitive institutions have adhered for five decades to a rule forbidding them to compete. They do not adhere because the rule serves them; they adhere because the Association has made departure economically irrational.

93. The NCAA's minimum aid requirements, scheduling rules, and guaranteed distributions also allocate markets. The structure partitions the market for athletic labor into three largely non-overlapping segments, assigns each segment a maximum permissible expenditure on athletic talent, and erects barriers sufficient to prevent movement between segments in response to competitive pressure. Division III is assigned the non-scholarship labor pool, Division II the partial-scholarship pool, and Division I is allowed the most flexibility in the consideration

it may offer for athletic labor, while remaining subject to its own ceiling. An agreement among competitors to divide markets in this way eliminates competition, just like price fixing does, and it is among the most clearly condemned forms of horizontal collusion.

### F. The Price Fixing Conspiracy Has Produced Anticompetitive Effects[31]

94. The NCAA's prohibition on athletic aid for Division III athletes has successfully enabled and ensured that competing Division III member institutions all pay the same fixed price for labor—nothing. These same institutions fund athletic aid wherever NCAA restrictions permit it, invest in recruiting and facilities, and use whatever other means available to attract the best Division III athletes to their institutions. But because of the Division III athletic aid prohibition, they do not compete by offering athletic scholarships. This is not how genuine competitors would make independent decisions in a properly functioning and truly competitive market. Indeed, the NCAA's "need" to impose the athletic aid prohibition implicitly acknowledges that Division III institutions would offer athletic aid if allowed.[32]

95. The NCAA's member institutions remain free to, and do, compete through coaching salaries, recruiting, staff, travel, and facilities, including the eight-figure complexes described above. This competition is unsurprising, especially because the zero-aid rule directs spending toward those inputs while preventing

[31] Under the per se standard applicable here, proof of facts showing the conspiracy's anticompetitive effects is unnecessary.

[32] Division III's rules do not stop at prohibiting athletic aid. They require that an athlete's aid package conform to what other students receive. Bylaw 15.01.4 requires that the composition of a college athlete's financial aid package be consistent with the established policy of the institution's financial aid office for all students, and Bylaw 15.3.1(a)–(c) requires that athletes' aid be awarded under the same procedures and produce a package not clearly distinguishable from the general pattern of aid for all recipients. Bylaw 15.3.1.1 requires annual reporting comparing aid to entering athletes with aid to other entering students. The Association enacted those consistency and reporting rules for a reason. It anticipated that its members would find ways to reward athletic ability through the financial-aid office even after the direct prohibition, and it built a surveillance mechanism to catch them.

athletes from receiving a negotiated share of their value even in the form of reduced tuition.

96. In other words, due to the anticompetitive athletic aid prohibition, the NCAA and its member institutions have collectively agreed to set the price of Division III athletic labor at $0, regardless of what a competitive market may demand.

97. Public data make the restraint's effect on the market for Division III athletic labor plainly visible. The following figures, drawn from federally mandated disclosures and association reporting, frame the disparity:

| **Association / Division** | **Athletes** | **Total Annual Athletic Aid** | **Aid per Athlete** |
|---|---|---|---|
| NCAA Division I | 165,392 | ~$3.42 billion | ~$20,665 |
| NAIA | 84,133 | ~$795.5 million | ~$9,455 |
| NCAA Division II | 115,906 | ~$844.9 million | ~$7,290 |
| **NCAA Division III** | **175,390** | **$0** | **$0** |

98. As the table shows, every association that permits athletic aid distributes it, at per-athlete levels ranging from roughly $7,290 in Division II, the tier subject to the next-harshest caps, to more than $20,000 in Division I and approximately $9,500 in the NAIA, whose members are largely small colleges with a fraction of the resources of many Division III institutions. These aid levels track regulatory permission, not institutional wealth. Division III, home to many of the wealthiest endowments in the country, sits below every one of them. The one tier

that distributes nothing is the one tier forbidden from doing so by college athletics' monopsonist, the NCAA.

99. Powerful evidence of the restraint's effect also comes from the Division III schools that simultaneously sponsor individual sports at the Division I level. For example, Johns Hopkins, a member of the Centennial Conference, sponsors elite Division I men's and women's lacrosse programs through which it hands out approximately $2 million in athletic aid annually (or about $22,000 per lacrosse player), and RIT, a member of the Division III Liberty League, sponsors Division I men's and women's hockey programs through which it hands out nearly $1.5 million (or about $27,000 per hockey player) in athletic aid. These programs exist because their institutions elevated them before the NCAA deliberately moved to close its multidivisional classification pathway, and the Association's grandfathering provisions allowed them to retain Division I status without requiring the host institution to satisfy full divisional minimums. *See* 2026–27 NCAA Division I Manual, Bylaws 20.5.1–20.5.1.1; 2026–27 NCAA Division III Manual, Bylaws 20.4 and 20.7.1.

100. The history of that pathway is difficult to square with any philosophical account of Division III's non-scholarship identity. After the NCAA created its three divisions in 1973, a Division III institution could classify a limited number of individual sports in Division I and award athletic aid in those sports without reclassifying the rest of its athletics department. In 1983, Division III did not close the pathway to elevation but prohibited future schools from using it and then providing athletic aid. In other words, Division III schools could still elevate specific programs to compete at the Division I level, but—even once elevated—these newly elevated programs were required to remain non-scholarship. In 2004, the Division III membership rejected a proposal to strip the grandfathered programs (those that had used the multidivisional classification pathway before 1983) of their ability to

offer athletic aid but reaffirmed that no additional Division III institution could take the pathway and offer athletic aid. In 2011, the NCAA closed the elevation pathway entirely, grandfathering only those programs already classified in Division I by the 2010–11 academic year. And in 2022, the Division III membership voted to allow any school that had previously elevated a program to begin providing athletic aid in it, while leaving the door closed to every school that might seek to elevate a program in the future. Confronted with live, successful examples of exactly the targeted competition its classification rules forbid, the Association methodically grandfathered the incumbents and locked the door to anyone who would follow.

101. Schools with these grandfathered programs demonstrate that Division III schools pay for athletic labor the moment the athletic aid prohibition does not apply. Hopkins's own athletic department has confirmed the asymmetry in plain terms: "Because both [the women's and men's lacrosse] teams are NCAA Division I members, they, unlike our other sports at Hopkins, are permitted by NCAA legislation to provide athletic scholarships."[33]

102. These schools generate a controlled experiment, isolating the effect of the prohibition. The same school, in the same semester, and with the same administration, endowment, and financial-aid office, pays athletes differently based solely on which NCAA bylaw applies. The experiment has even been run in real time. RIT's and Union College's Division I hockey programs were barred from awarding athletic aid until January 2022, when the Division III membership voted 388–18 to lift that bar for previously elevated programs. Both schools began awarding hockey scholarships immediately, and RIT's men's coach explained that recruiting conversations became "completely different" because "[d]ecisions don't have to be made based on finances anymore."

[33] See Spector, supra note 8.

103. Beyond these grandfathered programs, many Division III institutions sponsor sports wholly outside NCAA jurisdiction, boxing, archery, and cheer among them, and in those sports the same schools freely offer athletic aid alongside their NCAA-governed rosters. Every such program is another data point in the natural experiment the NCAA's own governance structure has built. A school that offers athletic aid in one sport on Tuesday and stands behind its price fix in its NCAA Division III sports on Wednesday knows exactly what athletic labor at that institution is worth.

104. Students may receive scholarships to perform in the marching band at games. Students who serve as cheerleaders may receive scholarships to cheer on the team. Yet the Division III athletes providing the athletic competition itself cannot receive scholarships for that contribution.

105. The athletic aid prohibition has also distorted investment in emerging activities, like esports. After roughly eighteen months of deliberation, the NCAA's Board of Governors voted in April 2019 against pursuing any governance role over collegiate esports. Into the vacuum stepped the National Association of Collegiate Esports, founded in 2016 with seven members and since expanded to hundreds. Published estimates place aggregate collegiate esports scholarships in the tens of millions of dollars annually, aid wholly unconstrained by NCAA caps because the NCAA declined to claim the territory. Approximately fifty NCAA Division III institutions now sponsor esports programs, with documented examples of such institutions awarding performance-based scholarships to current and recruited esports athletes of up to tens of thousands of dollars per year. RIT, the same institution that funds Division I hockey scholarships on an otherwise Division III campus, awards $2,000 esports scholarships to twenty incoming students each year, along with performance-based scholarships for select current students. Arcadia University awards esports scholarships ranging from $500 to $10,000 per semester.

Messiah University awards renewable esports scholarships of $1,000 to $5,000 per year, sized to a recruit's competitive experience and expected contribution to the program and conditioned on continued participation. And the University of Wisconsin–Eau Claire has offered five $2,000 esports recruitment scholarships to incoming students.[34] These scholarships, and countless others, would not exist had the NCAA elected to extend its domain over the emerging activity.

106. The implication for the but-for world is profound. When schools are relieved of the NCAA's aid architecture, not in theory but in a live market, they compete for students. They discount the cost of education, and they discount significantly. That a multimillion-dollar market for athletic aid sprang up in a single activity the NCAA declined to govern, at the very institutions bound by the Division III prohibition, is among the most damning available evidence of what the prohibition suppresses: not the schools' appetite to compete, but their permission to.

107. The restraint is especially harmful where institutions could respond to women's demand for collegiate athletics. Women constitute most of the college population, and more than 3.6 million girls play high school sports annually, more than twelve times the number who did so when Title IX of the Education Amendments of 1972 ("Title IX") was enacted. For colleges that rely on enrollment, retention, and alumni attachment, women's athletic programs should be appreciating as educational amenities and recruiting assets, as should the demand for the athletes that participate in those programs. A Division III institution may have demand, donor support, and a comparative advantage in one women's sport, yet the Division

---

[34] *See* Ira Porter, *Forget Football. College Students Are Scoring Big with Esports*, Christian Sci. Monitor (Sept. 21, 2023), https://www.csmonitor.com/USA/Education/2023/0921/Forget-football.-College-students-are-scoring-big-with-esports; *eSports at Messiah University*, Messiah Univ., https://www.messiah.edu/undergraduate-admissions/pages/esports/ (last visited July 19, 2026); *UW–Eau Claire Esports Scholarships Reward Gamers*, Univ. Wis. Sys., https://www.wisconsin.edu/all-in-wisconsin/story/uw-eau-claire-esports-scholarships-reward-gamers/ (last visited July 19, 2026); *RIT Introduces Esports Scholarships*, RIT News, https://www.rit.edu/news/rit-introduces-esports-scholarships (last visited July 19, 2026).

III prohibition on athletic aid prevents it from offering an athletic scholarship in that program, and the classification rules condition elevation on broader divisional commitments across a portfolio of other sports.

108. The NCAA's own data document a persistent and growing shortfall in women's participation in Division III championship sports. In 2001–02, women accounted for approximately 42.2% of Division III championship-sport participation, but by 2024–25, that number had fallen to 40.4%, despite the growing proportion of the applicant pool represented by women at these colleges and the rising rate of high school athletics participation. *See* NCAA, Sports Sponsorship and Participation Rates Report, 1981–82 through 2024–25, tables "Division I Overall" and "Division III Overall" (2025).

109. The historical record places this disparity in context. In 2014–15, women were 57% of undergraduates but only 43% of NCAA athletes, and the NCAA had earlier opposed full application of Title IX to football and men's basketball. Moreover, scholars frequently describe practices that inflate apparent opportunity, including counting one woman in cross-country and both track seasons and adding novice rowers who rarely compete, condemning the state of gender equity in college athletics as "a continuing disgrace." While Title IX and its private enforcement supplied the obligations to expand women's opportunities, Division III's prohibition on athletic aid and stifling divisional classification rules plainly chill investment in women's scholarship opportunities, even as the applicant pool naturally demands more of them each year.[35]

110. The injury alleged here is concrete. Athletes supplying athletic labor are denied the aid that independent institutions would offer, while schools' capacity to attract and retain those athletes through targeted scholarship programs is

[35] Gurney et al., *supra* note 7, at 143–48 & ch. 6 ("A Continuing Disgrace").

restricted. The NCAA permits Division I schools to invoke market demand when allocating substantial resources to football and men's basketball yet blocks a lower-tier institution from responding to its own applicants' demand with modest scholarships. This suppresses scholarship output and the development of athletic programs, including women's programs, below competitive levels. Restoring independent aid and program-investment decisions would allow that demand to influence investment, subject to each institution's continuing legal obligations, including Title IX. Indeed, Title IX's implementing regulations require any institution that awards athletic scholarships to allocate them to male and female athletes in substantial proportion to their participation, 34 C.F.R. § 106.37(c), so lifting the prohibition would, by operation of law, direct a proportionate share of new athletic aid to women.

111. Put simply, the anticompetitive and ongoing scheme to fix the price of Division III athletic labor at $0 was intended to, did, and still does benefit the Defendant and its co-conspirators. As the market for Division III athletics has grown, as shown by the Division's expansion and the acceleration of media rights deals for airing Division III athletics competitions, the price of the most critical input—athlete labor—has remained fixed at nothing.

112. The threat of "death penalty" sanctions punishes would-be defectors, and burdensome divisional reclassification and scheduling requirements and guaranteed revenue sharing with Division III reinforce the conspiracy. As a result, adherence to its terms remains near perfect.

113. This anticompetitive scheme has had the purpose and effect of setting the price of Division III athletic labor at zero during the Damages Class period nationwide.

///

///

**G. The Conspiracy Has Produced No Procompetitive Benefits**

114. There are no valid, procompetitive benefits to the NCAA's Division III athletic aid prohibition, certainly none that outweigh the myriad anticompetitive effects or cannot be obtained through less restrictive means. The Division III athletic aid prohibition is not reasonably necessary to promote "amateurism," "competitive equity," gender equity, or opportunities for women or Olympic sports athletes. Nor is it necessary to achieve any other claimed procompetitive benefit. If legitimate procompetitive benefits of the challenged restraint exist at all, the NCAA can achieve them without imposing the anticompetitive Division III athletic aid prohibition; any such benefits could be achieved through less restrictive means.

**H. Relevant Market and Market Power**

115. Direct evidence of anticompetitive effects makes elaborate market definition unnecessary. Where, as here, the same buyers observably pay for the same labor in every corner of the market the Division III athletic aid prohibition does not reach—in grandfathered Division I programs, non-NCAA sports, and esports—a court need not define the market to see the anticompetitive restraint's effect. Indeed, under the per se standard applicable here, proof of facts concerning market definition and power is unnecessary. Nevertheless, Plaintiffs plead the relevant markets in the alternative below.

***1. The Market for Division III Athletic Labor is the Relevant Market***

116. The relevant antitrust market, to the extent one must be defined, is the nationwide market for Division III athletic labor (the "Relevant Market").

117. The NCAA itself creates, brands, and enforces Division III as a distinct competitive tier with its own governance structure, championships, and rulebook, and the industry recognizes it as such.

118. The buyers are distinct, more than 400 schools bound by a price fix on athletic labor. And the price those buyers pay for Division III athletic labor is not

merely distinct, but uniform, fixed at zero by mandatory bylaw. Moreover, the market's sellers have distinct characteristics, athletes whose academic, athletic, and personal circumstances make higher-division programs or non-NCAA programs imperfect substitutes in practice.

119. Courts have repeatedly accepted relevant markets confined to Division I, a set of schools smaller than Division III's membership. *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), analyzed markets limited to Division I FBS football and Division I men's basketball. *Alston* proceeded at every level on a market for athletic services in Division I basketball and FBS football. The *House* settlement was certified and approved on materially identical definitions.

120. The NAIA does not serve as a practical substitute purchaser for sellers of Division III athletic labor. In fact, the Division III athletic scholarship prohibition proves NAIA's non-substitutability. If NAIA roster spots were a reasonable substitute for a Division III roster spot, a rule fixing the price of Division III athletic labor at zero would have prompted a sizable majority of the more than 175,000 athletes that compete in Division III each year to take their labor to the NAIA, which pays nearly $9,500 per athlete. They have not done so, and the rule endured.

121. The remaining national associations also do not supply plausible substitutes. The National Junior College Athletic Association, while permitting athletic aid, is composed exclusively of two-year institutions awarding associate degrees, so its roughly 70,000 athletes are not selling their labor in exchange for a four-year baccalaureate education paired with the amenity of varsity competition.

122. The National Christian College Athletic Association is not an independent pool at all. A substantial share of its member institutions hold dual membership in the NCAA or the NAIA and are therefore already counted in those associations' figures, and its membership is limited to institutions committed to an

explicitly Christ-centered mission, a defining product characteristic that makes it no substitute for the athlete not seeking a faith-based education.

123. The NCAA's Division III member institutions have possessed and continue to possess a dominant—indeed, exclusive—share of the market of purchasers of Division III athletic labor, as no other collegiate athletic association is a viable substitute purchaser in this market. Courts have recognized, and the NCAA has admitted to, this monopsony power. *See, e.g., NCAA v. Alston*, 594 U.S. 69, 90 (2021) ("The NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition.").

124. In the alternative, even if the relevant market comprises the labor of athletes at four-year institutions competing outside the NCAA's scholarship divisions, that is, Division III and the NAIA combined, the NCAA still possesses a dominant share of the market. Within that combined market, Division III accounts for approximately 68% of the athletes and approximately 64% of the institutions. By any measure, the more than 400 schools of Division III account for a commanding majority of all collegiate athletic opportunities at four-year colleges outside NCAA scholarship programs.

125. The United States is the relevant geographic market. NCAA bylaws, including the Division III athletic aid prohibition, operate at a national level. The NCAA organizes its member institutions and competitions at the national level. Athletes whose academic, athletic, and personal circumstances make other divisions an imperfect fit could not practically sell their athletic labor outside of the United States, where colleges and universities offer far fewer varsity athletic opportunities and athletes must comply with applicable immigration requirements. Division III institutions acquire athletic services from athletes throughout the United States.

## V. INTERSTATE TRADE AND COMMERCE

126. Defendant's conduct occurs in and substantially affects interstate trade and commerce. The NCAA and its member conferences govern and organize intercollegiate competition involving institutions that recruit students across state lines, field traveling teams, and sell and license athletic content nationally. Defendant administers the challenged rules and revenue arrangements across state lines. Division III institutions acquire athletic services from athletes throughout the United States.

127. The NCAA's aggregate operating revenue exceeds one billion dollars annually, generated overwhelmingly by the sale of national broadcast rights and championship products moving in interstate commerce. The guaranteed distributions challenged in this Complaint are paid across state lines to member institutions and conferences nationwide.

## VI. CONTINUING VIOLATION

128. The violation alleged in this Complaint is continuing. Defendant republishes the challenged bylaws annually, enforces them daily, requires member institutions to abide by the challenged provisions of the NCAA Constitution, and pays the guaranteed distributions on an ongoing basis.

129. Plaintiffs allege that Defendant set the price for Division III athletic labor at $0 through its prohibition on athletic aid at Division III member institutions.

130. Due to this anticompetitive conduct, throughout the class period and to the present, Defendant and its co-conspirators set the price for Division III athletic labor at $0 nationally and in the Relevant Market.

131. Plaintiffs and class members received no athletic aid due to the NCAA's Division III athletic aid prohibition.

132. Each academic term in which a Division III institution provides zero athletically related aid to an athlete pursuant to the challenged agreement is a new

overt act inflicting new injury. Division III institutions determine and issue financial aid awards anew for each academic year, and each annual award must independently comply with Bylaw 15.

133. The NCAA's unlawful acts and practices described herein continue to this day.

134. Accordingly, Plaintiffs and members of the class were injured and may recover for damages suffered at any point during the class period.

## VII. <u>CLASS ACTION ALLEGATIONS</u>

135. Plaintiffs bring this action on behalf of themselves and the following classes of all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and Local Rule 23-2. Printz, Jennings, and Hale seek to represent the Damages Class, and Hale seeks to represent the Injunctive Class, as defined below:

> The Damages Class: All persons who, at any time from October 21, 2022, through the date of judgment, competed on an NCAA Division III varsity intercollegiate team. Excluded from the Damages Class are Defendant's officers, directors, and employees, judicial officers assigned to this case and their staff, and counsel of record.

> The Injunctive Class: All persons who currently compete, or during the pendency of this action will compete, on an NCAA Division III intercollegiate team.

136. The classes are so numerous that joinder of all members in this action is impracticable. Approximately 175,390 athletes compete in Division III in a single academic year, and the Damages Class spans multiple years. The Injunctive Class is of comparable annual size and continuously replenishing.

137. The class members can be readily identified and notified in an administratively feasible manner, using among other information, NCAA Division

III member institution enrollment records, varsity athletic participation records, rosters, eligibility filings, and compliance submissions.

138. There are many legal and factual questions common to the classes and susceptible to proof by the classes with evidence common to all class members, including: (a) whether Defendant and its co-conspirators entered into and maintained the horizontal agreement alleged here; (b) whether the Division III athletic aid prohibition unreasonably suppresses compensation or restricts output and competition; (c) the relevant market and Defendant's collective power; (d) whether Defendant's misconduct constitutes a per se violation of Section 1 of the Sherman Act; (e) whether, in the alternative, Defendant's misconduct violates Section 1 of the Sherman Act pursuant to a quick look or full Rule of Reason analysis; (f) whether any claimed competitive benefits are substantiated and could be achieved through substantially less restrictive alternatives; (g) whether the Division III athletic aid prohibition caused common antitrust injury to the class members in the form of artificially suppressed prices for their labor; (h) the appropriate measure of class-wide damages; and (i) the scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendant's alleged conduct going forward.

139. Plaintiffs' claims are typical of those of the classes. Plaintiffs and every class member allege and will show that they supplied athletic labor to a Division III institution and were paid the fixed price of zero pursuant to the same written restraints, which artificially suppressed the price they would have received for such labor in a competitive market. Plaintiffs and all class members also claim that the Division III athletic aid prohibition violates Section 1 of the Sherman Act. Plaintiffs competed or currently compete across a cross-section of teams and individual sports at institutions of differing conferences, sizes, and profiles.

///

///

140. Plaintiffs will fairly and adequately protect and represent the interests of the class members. The interests of Plaintiffs and Plaintiffs' counsel are fully aligned with, and not antagonistic to, the interests of the class members. Plaintiffs have no conflicts with absent class members. Plaintiffs will and can dispatch the duties incumbent on a class representative to protect the interests of all class members.

141. Plaintiffs' counsel—ArrowBlue, PLLC, Burns Charest LLP, Christine Brown Sports Law, PLLC, and Brown, Neri, Smith & Khan, LLP—are experienced and competent in prosecuting antitrust class actions and college sports litigation, including actions against the NCAA.

142. Proposed class counsel have already devoted many hundreds of hours to identifying and investigating the claims alleged in this Complaint, including the historical, economic, and governance record set out above, and possess the experience, knowledge of the applicable law, and resources that Rule 23(g) requires. Counsel have prosecuted athlete-side antitrust, wage, and Title IX matters against the NCAA, its conferences, and its member institutions. Counsel possess and have committed, and will continue to commit, the resources necessary to vigorously prosecute this action to the greatest extent necessary for the class.

143. Legal and factual questions common to class members will predominate over any individual legal questions and factual questions. Defendant has acted and refused to act on grounds generally applicable to the classes. The restraint imposed the same zero price on every class member through the same written bylaw, and class-wide impact and damages are provable through common econometric evidence of the kind courts have accepted in analogous compensation-suppression cases, including those benchmarking suppressed aid against observed behavior in aid-permitting comparator markets.

144. A class action is superior to separate actions for resolving these issues fairly and efficiently, which no individual athlete could economically litigate alone. Proceeding as a class action allows the many class members to prosecute their common claims, and Defendant to defend itself against those claims, in one court simultaneously and efficiently without the unnecessary duplication of effort and expense presented by separate actions. The benefits of proceeding with this procedural mechanism, including providing injured people with a way to obtain redress for claims that may be impracticable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## CLAIM FOR RELIEF

## COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

### Horizontal Agreement Fixing Price of Division III Athletic Services

145. Plaintiffs incorporate and reallege each of the foregoing allegations as though fully set forth here.

146. Defendant and its co-conspirators entered into and maintain a continuing contract, combination, or conspiracy that unreasonably restrains competition for Division III athletic services. The agreement joins more than 400 independent institutions, each a separate economic actor and an independent center of decision making, that compete to acquire Division III athletic labor. It is implemented through the NCAA and its member conferences. The Division III athletic aid prohibition is entrenched by the mandatory divisional revenue distributions, the classification restrictions linking individual-sport investment to broader divisional obligations, and the scheduling requirements that limit competitive alternatives. The athletic aid prohibition fixes the price of Division III athletic labor at zero and suppresses the output of athletic scholarships and

competitive programs. This scheme, which the NCAA has led, facilitated, and enforced, has led to anticompetitive effects by causing Plaintiffs to receive artificially suppressed prices for their services during the Damages Class period that fall below the competitive price they would receive in a competitive market.

147. The agreement is a horizontal restraint among competing buyers of labor that fixes price and restricts output. It is unlawful per se. In the alternative, its anticompetitive effects are sufficiently obvious that it is unlawful under an abbreviated quick look analysis. In the further alternative, it is unlawful under the full Rule of Reason analysis. Defendant and its co-conspirators collectively possess market and monopsony power in the markets alleged above (*i.e.*, the nationwide market for Division III athletic labor), and the agreement has caused actual suppression of athletic aid and competitive output. There are no procompetitive justifications for the prohibition on athletic aid for Division III athletes, and any proffered procompetitive justifications, to the extent any exist, could be achieved through substantially less restrictive alternatives.

148. As a direct and proximate result of Defendant's past and continuing violation of Section 1 of the Sherman Act, Plaintiffs, the Damages Class, and the Injunctive Class have been injured and will continue to be injured by receiving less compensation for their athletic services than they would have received through independent competition. This is antitrust injury of the type the Sherman Act protects against. The challenged restraint reduces the compensation available to class members and prevents institutions from responding to athletic demand with scholarships and targeted program investment.

149. Plaintiffs and the Damages Class seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for Defendant's conduct in violation of the Sherman Act. Plaintiffs seeking prospective relief and the Injunctive Class face continuing loss of competitive aid offers during finite eligibility periods, for which

retrospective damages do not provide complete relief. They seek declaratory relief and a permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, directed to the elimination of the challenged restraint, together with reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the classes of all others similarly situated, respectfully request that the Court enter judgment against the Defendant as follows:

A. Determine that this action may be maintained under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certify the classes defined above, appoint Plaintiffs as class representatives and their counsel as class counsel, and direct appropriate notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, to the classes once certified;

B. Adjudge and declare that the horizontal agreement alleged in this Complaint violates Section 1 of the Sherman Act;

C. Permanently enjoin Defendant, its officers, agents, employees, and all other persons in active concert or participation with it who receive actual notice of the injunction, from continuing, maintaining, or renewing the conduct alleged herein, or from engaging in any other conduct or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. Award Plaintiffs and the Damages Class damages to the maximum extent allowed under the applicable laws, trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15;

E. Award prejudgment and postjudgment interest in the maximum amount and to the maximum extent permitted by law;

F. Award Plaintiffs their costs of suit and reasonable attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and

G. Retain jurisdiction to enforce the judgment and grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 22, 2026

**BROWN, NERI, SMITH & KHAN, LLP**

Andrew M. Purdy (CA Bar No. 261912)

**ARROWBLUE, PLLC**
Michael A. Goldberg (pro hac vice application forthcoming)

**CHRISTINE BROWN SPORTS LAW, PLLC**
Christine D. Brown (pro hac vice application forthcoming)
Ben LaCourse (pro hac vice application forthcoming)

**BURNS CHAREST LLP**
Matt Strauser (pro hac vice application forthcoming)
Christopher J. Cormier (pro hac vice application forthcoming)
Ian U. Baize (pro hac vice application forthcoming)

*Attorneys for Plaintiffs and the Proposed Classes*